No. 23904

**Richard Lynn Kurtz and Epifanio Jesus Barrientos alias Jesse Barrientos v. The People of the State of Colorado**
(494 P.2d 97)

Decided February 22, 1972. Rehearing denied March 13, 1972.

308

Epstein, Epstein and Lozow, Donald L. Lozow, Gary Lozow, for plaintiffs in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, Michael T. Haley, Assistant, David A. Sorenson, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

The defendants were convicted of first degree murder and sentenced to life imprisonment. The homicide was committed at about three o'clock a.m. on November 16, 1967, at South Fork, Rio Grande County, Colorado, by three men as they were making their escape from a store following an aborted burglary.

At about two-thirty o'clock a.m. the owner of the store, who regularly left the lights on in the store all night, became aware that the store was being burglarized. The owner's wife telephoned Joe Stout, a neighbor, and asked him to come to

their residence. The owner's wife then proceeded to telephone the law enforcement officers in the area. While awaiting the arrival of the sheriff and other law enforcement officers, the owner and Mr. Stout proceeded to the store armed with rifles and hand guns. Their purpose was to prevent the burglars from leaving the store before the arrival of the law enforcement officials. The owner guarded the front door and Mr. Stout took up position near the rear door. A 1967 white Mustang was parked with the keys in the ignition immediately adjacent to the rear door. Witnesses heard shots being fired. One witness testified that "somebody started hollering at me, they would kill me if I didn't bring them the car keys." More shots were heard. The burglars had escaped through the rear door. Mr. Stout was found dead beside the Mustang with its keys in one of his pockets.

Within 30 minutes after the shots were fired, one Twyford, charged jointly with the two defendants but severed for purposes of the trial, returned to the area in front of the store and surrendered himself to one of the officers. He acknowledged that two other individuals were involved with him in the burglary.

Kurtz and Barrientos, the defendants here, were apprehended the afternoon of the day following the murder as they were walking along the main highway between South Fork and Del Norte, the county seat. From the investigation and search the law enforcement officers were able to reconstruct the escape route of Kurtz and Barrientos. It led from the store across the south fork of the Rio Grande River, which runs along the foothills, and eventually back to the highway near where the two were arrested. Clothing, worn by the defendants, matched that described by witnesses.

The physical evidence — the condition of the ice over the river, footprints in the mud along the ditch, items taken from the store, "fuzz" from Kurtz' jacket found on a fence, coins taken from the coke machine in the store, and the keys to the murder victim's truck, all of which were found at various placed along the route — were circumstances directly connecting the defendants to the burglary and the murder

committed in connection therewith.

Eyewitness descriptions and cloth fuzz found at the end of the trail leading from the scene of the crime matched a coat that Kurtz was wearing at the time of the arrest. This fact not only linked Kurtz to the crime, but also, in view of apprehension together of the two defendants in the vicinity of the crime and their bedraggled condition, it also linked Barrientos to the crime.

At the trial evidence was introduced to reconstruct the events leading up to the morning of the 16th. At trial, then, evidence was introduced to show the following:

(1) That the police in Omaha, Nebraska knew Kurtz, Twyford and Barrientos to associate with one another;

(2) That the three had been observed together on the 13th of November;

(3) That on the 14th of November the Adams Driveaway Company had put a white 1967 Mustang into the custody of Twyford in Omaha;

(4) That Twyford, driving a white Mustang, had rented a room in an Englewood motel on the morning of the 15th and that three men had stayed in the motel;

(5) That fingerprints of the defendants and Twyford were in the interior of the Mustang.

As to this chain of events, its relevancy and materiality, appellants make no assignment of error. Further, this chain of circumstances, when coupled with other facts (*e.g.,* eyewitness' descriptions of the burglars' apparel) and considered in the light most favorable to the prosecution, constitutes sufficient evidence to withstand defendants' motions for acquittal.

I.

■ As to the evidence taken from the Englewood motel room, appellants urge fatal error. The record shows that the motel owner testified directly to the effect that a man, positively identified as Twyford, rented a room at ten o'clock in the morning of the 15th, that this man was driving a white Mustang, and that, although the registrant rented a room for two persons, three beds had been used when the owner went

to examine the room at nine o'clock in the evening. Further, the motel owner identified a pillow and pillowcase, removed from the Mustang after seizure at the scene of the crime, as being those which had been supplied by the motel.

The trial judge, although he stated that he would instruct the jury as to the limited purpose for which these exhibits were admitted, failed to do so. Appellants urge this as error, relying on *Stull v. People,* 140 Colo. 278, 344 P.2d 455, as a statement of mandatory procedure controlling the use of "other crimes" evidence.

". . . First, the prosecutor should advise the trial court of the purpose for which he offers the evidence. Secondly, if the court admits such evidence, it should *then and there* instruct the jury as to the limited purpose for which the evidence is being received and for which the jury may consider it. Thirdly, the general charge should contain a renewal of the instruction on the limited purpose of such evidence. Lastly, the offer of the prosecutor and the instructions of the court should be in carefully couched terms: they should refer to 'other transactions,' 'other acts,' or 'other conduct,' and should eschew such designations as 'similar offenses,' 'other offenses,' 'similar crimes,' and so forth. . . ."

The *Stull* doctrine, which we reaffirm, is premised on the proposition that a defendant should not be tried for a crime wholly independent of the offense for which he is on trial. In the *Stull* opinion this court in commenting on this point said: "And a presumption of guilt should not be generated against an accused by showing that he committed a crime indicative that he is a depraved person who likely would commit the crime for which he is being tried. . . ."

Here, the evidence relating to the motel linen was not introduced to show the transaction at the motel as independent criminal activity, but was used as one circumstance in a chain of circumstances to establish that the defendants accompanied Twyford from Omaha to the scene of the crime charged.

This evidence corroborated the motel owner's identification of Twyford and connected the defendants to the white

Mustang and also established that the three men, who were together in Omaha, were still together in Denver, and was admissible for this purpose.

It would be wholly unrealistic to believe that a jury would be so naive as to convict persons of murder on the basis of evidence that a pillow taken from a motel room was found in the car in which they had travelled to the scene of the crime.

Although the trial judge should have instructed the jury as to the limited purpose of this evidence, his failure to do so under the circumstances of this case, considering the petty nature of the offense as compared with the gravity of the charge against the defendants, was harmless error beyond a reasonable doubt.

## II.

The error primarily relied upon by the defendant for reversal relates to the admission in evidence, over objection, of all exhibits seized in a search of the white Mustang automobile. At the time of the seizure the defendants had not been apprehended.

Although the sheriff obtained a search warrant authorizing the search of the Mustang, the Attorney General concedes that the affidavit upon which the validity of the warrant depends was insufficient. There can be no argument on this score. The affidavit does not contain a single recitation of an underlying fact. *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723.

If the search of the automobile and the seizure of the articles found therein are to withstand the constitutional assault of the defendants, their validity must stand as a warrantless search.

■ The validity of automobile searches, like most search and seizure problems, turn upon their own peculiar circumstances. *Go-Bart Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374. *Cowdin v. People,* 176 Colo. 466, 491 P.2d 569. Our examination of the facts in this case leads us to the conclusion that the defendants' attack must fail.

As indicated in the statement of facts, the Mustang figures prominently in the drama of the tragedy that is this case. It

was parked at the back door of the Foothills Market with the keys in the ignition. The car carried Nebraska license plates. Mr. Stout had positioned himself near the back door to prevent the burglars from leaving the store, and had removed the key from the ignition. Also, others in the vicinity at the time of the shooting heard someone threaten to kill the party who had the key to the car unless it was handed over.

It clearly appears that the car brought the burglars to the scene of the crime and that it was the intention of the burglars to use it to effect their escape. The sheriff thus had probable cause to believe that the car was involved in the crime. A careful and competent police officer in the conduct of an investigation, given the facts of this case, could reasonably expect to find fingerprints of those who arrived at the store either on the vehicle itself or on its contents.

There is a compelling reason to uphold the validity of the search of the automobile under the circumstances of this case. The defendants had *abandoned* the Mustang. They, therefore, had no standing to suppress the evidence as "a person aggrieved." Colo. Crim. P. 41(e).

We recognize the public interest in affording maximum protection to the right of privacy protected by the Fourth Amendment. Concomitant with the assertion of the right to privacy is the requirement that the one who asserts the right must establish that he was the victim of an invasion of his privacy. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697.

In *Thom v. State,* 248 Ark. 180, 450 S.W.2d 550, the Arkansas Supreme Court had a Fourth Amendment problem factually comparable to the instant case. The analysis by Mr. Justice Byrd is the most graphic exposition of the applicable principle we have seen. We quote:

". . . Sometimes an automoible takes on the characteristics of a man's castle. Other times an automobile takes on the characteristic of an overcoat — that is, it is movable and can be discarded by the possessor at will. If appellant in his endeavors to avoid the clutches of the law had discarded his overcoat to make his flight more speedy, no one would think

that an officer was unreasonably invading his privacy or security in picking up the overcoat and searching it thoroughly. In that situation most people would agree that the fleeing suspect had abandoned his coat as a matter of expediency as well as any rights relative to its search and seizure. What difference can there be when a fleeing burglar abandons his automobile to escape the clutches of the law? We can see no distinction and consequently hold that when property is abandoned officers in making a search thereof do not violate any rights or security of a citizen guaranteed under the Fourth Amendment."

The rationale of *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, supports the abandonment doctrine. There, the defendant, at the insistence of immigration officers, checked out of his hotel room. After he had done so, but before the regular check out hour, an FBI agent, with the consent of the hotel management, searched the room and seized articles left there by the defendant. The court said (Id. at 241, 80 S.Ct. at 698):

". . . it was entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. Nor was it unlawful to seize the entire contents of the waste basket, even though some of its contents had no connection with crime. So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia.* There can be nothing unlawful in the government's appropriation of such abandoned property. . . ."

*See Feguer v. United States,* 302 F.2d 214, and cases cited therein. (Opinion by Blackmun, J.) *See also United States v. Edwards,* 441 F.2d 749, involving the abandonment of a car.

In *United States v. Polk,* 433 F.2d 644, Wisdom, J., said: "The rationale for this holding is that an automobile owner can have no reasonable expectation of privacy with respect to the car's [vehicle identification number], . . ."

The defendants here, when they fled, manifested an intent to abandon whatever expectation of privacy they may have had. The record is clear on this point.

In *Parman v. United States,* 399 F.2d 559, *cert. denied,* 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126, the court held that the defendant had no constitutional right to protest the legality of a search of an apartment that he had abandoned. In answer to the argument that this holding encroached upon the deterrence rationale of the Fourth Amendment, Judge (now Chief Justice) Burger noted that the exclusionary rule does not apply to third persons, and said:

". . . We see no reason for treating a person who abandons property before the search any differently from a third party."

Viewing the facts of this case in the light of precedent, the record discloses a combination of factors which lead to the conclusion that the search was *reasonable*: Commission of the felony murder; the abandonment of the car by the suspects at the scene of the crime; their flight from the scene on foot into the night and their remaining at large.

As noted above, the search of the car was properly a part of the investigation.

### III.

Defendant Barrientos claims error in the denial of his motion for severance from the defendant Kurtz. One who is jointly charged with a crime is entitled as of right to a separate trial only where evidence, other than reputation or character testimony, would not be admissible in a separate trial of the moving defendant. Colo. R. Crim. P. 14. The granting or denial of a severance lies within the sound discretion of the trial court. Where not a matter of right, the denial of a severance does not constitute error unless there is a clear abuse of discretion and the record discloses an infringement of accused's right to a fair trial. *Mukuri v. People,* 92 Colo. 306, 19 P.2d 1040; *Kolkman v. People,* 89 Colo. 8, 300 P. 575; *Flor v. People,* 73 Colo. 403, 215 P. 875.

At trial, there was introduced the following evidence,

which Barrientos claims was admissible only against Kurtz and, therefore, in violation of the above rule: first, the car driving agreement with only the names of Kurtz and Twyford on it; second, a bit of cloth found on a fence near the scene of the crime, which was connected by expert testimony to Kurtz' coat; third, a statement by Sheriff Robran that pants found in the Mustang fit Kurtz perfectly; fourth a telephonic statement of Kurtz to his lawyer which was overheard by the sheriff, "I want to take the sheriff to South Fork and show him the .22 pistol." As to the last item a limiting instruction was given. As to all of the evidence, except the telephonic statement of Kurtz to his lawyer, there is no question but what these would be admissible against Barrientos in a separate trial. Consequently, there has been no prejudice as a result of the admission of that evidence.

The statement of Kurtz to his lawyer which was overheard by the sheriff was not admissible against Barrientos and it would have been better trial procedure not to have admitted the statement in evidence. However, the court gave a limiting instruction and in view of the overwhelming evidence of Barrientos' involvement in the burglary, the admission of this evidence does not constitute reversible error.

In *Smaldone,* we held that a co-defendant cannot object to evidence of the history of the joint undertaking, even though it involved the commission of a crime by one or more of the other co-defendants, if the history of the enterprise might throw light on the motive he or his co-defendants might have had for committing another crime, and which constitutes a chain of circumstances throwing some light on the probability of their having jointly undertaken to commit the crime charged.

Here, the evidence to which objection was made were links in a chain of evidence connecting each of the defendants with the joint undertaking which resulted in the commission of the crime with which the defendants were jointly charged.

IV.

The defendants assert error in the failure of the court to grant a motion for change of venue. We have studied

the *voir dire* examination of the jury and affidavits submitted to the court. Just as was the case in *Small v. People,* 173 Colo. 304, 479 P.2d 386, there was not present here the extensive and pervasive publicity as found in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed. 600; and *Walker v. People,* 169 Colo. 467, 458 P.2d 238. The *voir dire* examination disclosed that the members of the jury did not have impressions or opinions which would be fatally prejudicial to the defendants or either of them. *See* Colo. R. Crim. P. 24(a)(2)(vi).

"The fact that several jurors, or all the members of the panel, have read newspaper articles relating to a case does not disqualify them as jurors. This is true even though a juror may have had a pre-conceived notion as to the guilt or innocence of an accused. 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Evans v. Arizona,* 410 F.2d 1122 (1969).

## V.

The court, over defendants' objection, allowed the sheriff, who was a material witness for the People, daily to take part in calling the court to order, and to select a few prospective jurors on open venire. The court also refused to give an instruction to the effect that no particular weight was to be attached to the sheriff's testimony by reason of his court functions. Defendants contend that the jury would be inclined to give undue emphasis to the sheriff's testimony since he was acting as an officer of the court in the presence of the jury. So far as we have been able to glean from the record, which incidentally consists of 5,044 folios, he was not placed in charge of the jury at any time. The matter here does not come within the scope of *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424, cited by the defendants. There, the deputy sheriffs, who were material witnesses, spent a considerable amount of time in charge of the jury when it was out of the the courtroom. We think that reversible error was not committed here, but believe that it is better practice not to permit a material witness to function as an officer of the court.

## VI.

Error is claimed by the failure to delete from the coroner's death certificate, which was admitted in evidence, the phrase that the victim was "helping neighbor investigate burglary of neighbor's store and shot by one of the burglars during this investigation." No question was raised as to the fact that the victim was shot by one of those burglarizing the store. As a consequence, we do not regard the admission of the death certificate containing the above quoted statement as reversible error, particularly when the court later instructed the jury to ignore that portion of the certificate. It would be much better practice to delete included hearsay. However, as there was no prejudice, there is no error. *Gallegos v. People,* 157 Colo. 484, 403 P.2d 864; *Allison v. People,* 109 Colo. 295, 125 P.2d 146; *Granato v. People,* 97 Colo. 303, 49 P.2d 431.

## VII.

Barney Black, Chief of Police at Del Norte, who arrived on the scene shortly after the aborted burglary, testified for the state that Mr. Twyford was placed in this custody and that pursuant to conversations with Mr. Twyford, he radioed a description to the Alamosa dispatcher in order to aid in the arrest. The appellants urged that this testimony, along with testimony as to the substance of the description sent out by Chief Black, constituted error (1) because it was inadmissible hearsay and (2) because it was testimony of a co-defendant as to whom the severance had been granted (and that it thus operated so as either to deprive defendants of an opportunity to cross-examine or to require a waiver of the benefits of a severance to which they were entitled).

The defendants' first objection has no merit. This jurisdiction permits extrajudicial identifications of a defendant as substantive evidence and as an exception to the hearsay rule. Further, we note that this exception has been extended to extrajudicial identifications heard or observed by a third person. *Cokley v. People,* 168 Colo. 52, 449 P.2d 824; *Gallegos v. People, supra.* Finally, even if this were inadmissi-

ble hearsay, we hold that in light of the other material evidence relating defendants to the crime, this identification was clearly cumulative and any error was harmless. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284.

 As to defendants' arguments concerning the effect of this evidence on the severance, we hold that there was no prejudice. First, we note that the description as given by Twyford to Chief Black was a very general description which Chief Black conceded did not accurately describe Kurtz. Further, there was some suggestion that the description as given did not describe Barrientos. As a matter of fact, the testimony of Chief Black, which was attributed to Twyford, did not purport to specifically identify either Kurtz or Barrientos, rather it related to the sex, nationality, approximate ages, height and weight of those who participated in the burglary with Twyford. In *Cokley* and *Gallegos,* the circumstances in relation to the hearsay testimony was similar to that in the instant case. In both of those cases we approved of the trial court's admission of the testimony. The evidence here was primarily a part of the story of the search for and arrest of the two defendants on trial. In view of the inconclusive nature of the identification, it cannot be said that there was any prejudice to the defendants from the admission of this evidence. Although it would clearly be a better procedure to conceal the source of the extrajudicial identifications in the instant case, we find no basis for reversal.

## VIII.

 Kurtz' counsel stated in summation that Kurtz "stood by and came into this courtroom and told you he was not guilty." During rebuttal the district attorney responded as follows: "I was intrigued by the statement [by Kurtz' counsel] 'I haven't heard a word from Kurtz and you haven't heard a word on the jury. There wasn't one word that has been said.'" The appellants assert that this was a prejudicial comment on defendant's failure to testify. Though we believe that both counsel stepped beyond the bounds of proper

advocacy, we do not find that the prejudice in this case warrants a reversal.

First, the trial court properly instructed the jury that the defendant's failure to testify could not be considered as evidence of guilt or innocence. Second, it is generally accepted that defense counsel may by improper argumentive comment open the door to a response by the prosecuting attorney. *Hafer v. People,* 177 Colo. 52, 492 P.2d 847; *Kelly v. People,* 121 Colo. 243, 215 P.2d 336; *Fries v. People,* 80 Colo. 430, 252 P. 341; *Goodfellow v. People,* 75 Colo. 243, 224 P. 1051.

## IX.

On December 4, 1968, while defendants' appeal was pending in this court, defendants filed a motion for new trial on grounds of newly discovered evidence. Crim. P. 33 provides in part:

". . . If a review is pending, the court may grant the motion [for new trial] only on remand of the case."

Accordingly, the trial court properly declined jurisdiction and that motion is not before us. If subsequent to announcement of this opinion, defendants wish to pursue the newly discovered evidence before the trial court, there will be ample time for this court to consider the ruling on that motion on review.

## X.

The defendants contend that the court erred in not submitting second-degree murder, voluntary manslaughter, involuntary manslaughter, first-degree burglary and accessory after the fact to murder as lesser included offenses. The charge here is first degree murder occurring during the commission of a felony. In such instances lesser included offenses need not be submitted to the jury. *Whitman v. People,* 161 Colo. 110, 420 P.2d 416.

## XI.

Defendants claim that their tendered instruction on their theory of the case should have been given, citing *Payne v. People,* 110 Colo. 236, 132 P.2d 441. On the contrary, they presented no evidence. Therefore, there was no basis for

an instruction on their theory of the case.

### XII.

We find the remaining assignments of error without merit. Judgment affirmed.

MR. JUSTICE DAY, MR. JUSTICE GROVES, and MR. JUSTICE ERICKSON dissenting.

MR. JUSTICE GROVES dissenting:

I respectfully dissent.

### I.

As stated in the majority opinion, the fundamental issue in this case is the search and seizure question. This must be considered as a warrantless search. At the time it was conducted, Twyford had been arrested and the two defendants here had not. Twyford had told the authorities of the contents of the car and had described the defendants. The Attorney General concedes that the search could not be justified as being incidental to Twyford's arrest. Since the two defendants had not yet been arrested, the search *ipso facto* could not be incident to their arrest.

I have been unable to find anything in the record — and no contention has been made — that the search was necessary in order to aid in the apprehension of the defendants. Assuming *arguendo* that this warrantless search might be justified by reason of exigent circumstances, I am unable to perceive any exigent circumstances. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

The Attorney General states in his brief:

"Since the police in the case at bar had valid possession of an automobile used by the men who had committed the burglary and murder, and since the police searched the car for evidence related to the aforesaid crimes, their search was reasonable, especially in light of the fact that two of the suspects were still at large and could possibly destroy the evidence contained in the car."

With the sheriff in possession of the car and having had it stored in his own garage, I cannot accept the argument that

the search was justified in order to prevent the suspects from destroying evidence contained in the car. In contrast to a situation where there is no time to obtain a search warrant, there is some significance in the fact that here the sheriff took the time to prepare an affidavit (albeit a defective one) and obtain a search warrant from a district judge.

It would thus seem that if the search is to be justified it must be upon the reason which the majority terms "compelling," *i.e.,* the defendants' lack of standing to object to the search by reason of their abandonment of the Mustang.

After this matter was at issue here we asked the parties to submit additional briefs on the search and seizure question as to "Whether the defendants, who allegedly fled on foot, have standing to raise the question." In the defendants' additional brief it is pointed out that the question of standing is being raised for the first time by this court; the matter was not presented to or argued before the trial court; and that, until we asked for the supplemental briefs, nothing had been said here.

If this case is to be controlled by the matter of standing, it is imperative that the defendants have an opportunity to present evidence on the issue. They did not testify at trial, and in an *in camera* proceeding, they conceivably could negate the fact of abandonment of the car or negate any connection with the car. Also, they might claim a proprietary interest in the articles seized and thereby invalidate the search since it was conducted out of their presence. *Jones v. United States,* 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960); and *United States v. Jeffers,* 342 U.S. 48, 72 S. Ct. 93, 96 L. Ed. 59 (1951). They simply have not had their day in court on this all-important question.

II.

If the admission in evidence of the pillow and pillowcase had been the only error committed in the trial, one might brush over it as *de minimis.* This should not be done here, however, for two reasons: (1) the statement of the trial judge that he would give an instruction as to these articles; and (2) the several errors committed in the trial of this case.

When these articles were offered in evidence, counsel for Barrientos objected. The district attorney stated that the exhibits were offered "for the purpose of showing that this was the particular car that was there." The court stated, "I'm going to instruct the jury when I get around to the admission of the stuff, it is solely for the purpose of establishing that fact and that fact alone, not for the purpose of proving any crime." Later, the exhibits were admitted in evidence without any cautionary oral instruction on the part of the court, and the subject was not mentioned in the court's final instructions.

I regard the portion of *Stull v. People,* 140 Colo. 278, 344 P.2d 455 (1959), quoted in the majority opinion as controlling. The Attorney General argues that this did not constitute reversible error because the defendant did not ask for the oral instruction at the time the exhibits were entered in evidence and did not tender a written instruction at the conclusion of the evidence. When a court assures counsel that it is going to do something which the law requires, the court has undertaken that obligation and the absence of further objections or requests on the part of counsel does not modify the court's duty. Under the circumstances of this case, 'this was prejudicial, reversible error.

While a constitutional question is not presented as in *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), I think the *Chapman* analysis supports the proposition that a court does not as readily overlook an instance of *de minimis* error if there is other prejudicial error in the record. In other words, in light of these other errors, I do not think it can be said that the admission of the stolen pillow and pillowcase without a limiting instruction was harmless beyond a reasonable doubt.

### III.

Error was committed in not granting Barrientos a severance. In this connection, it must be born in mind that, if evidence obtained in the search were not admissible, the only evidence connecting Barrientos with the crime are the facts that he was with Kurtz and Twyford in Omaha three days

prior to the homicide and that he and Kurtz were together when they were arrested. With this setting and under my view of the search, it can be seen that admission of evidence linking Kurtz, and not Barrientos, with the crime could easily be prejudicial error so far as Barrientos is concerned.

Long prior to trial Barrientos moved for severance. At that time the district attorney objected and stated that there would be no substantial evidence that could be used only against Kurtz. In contrast, as set forth in the majority opinion, there was admitted in evidence: (1) the driving agreement with only the names of Kurtz and Twyford appearing on it; (2) the piece of cloth connected with Kurtz' coat found near the scene of the crime; (3) the trousers found in the Mustang which fit Kurtz perfectly; (4) Kurtz' statement, made out of the presence of Barrientos, "I want to take the sheriff to South Fork and show him the .22 pistol." The admission of this evidence, after the court had denied severance upon the assurance of the prosecution that no such evidence would be presented, constituted reversible error. Crim. P. 14; and *United States v. Kelly,* 349 F. 2d 720 (1965).

### IV.

The court ordered that Twyford should be tried separately. My reading of the record discloses that the description of Barrientos which Chief Black placed over the radio was rather accurate. The accuracy or inaccuracy of the descriptions, however, is of marginal importance. The real prejudicial error here is in the testimony of the chief to the effect that it was Twyford who gave him this information. Objection was made and there was a motion for mistrial. The court overruled these objections and denied defendants' motion for mistrial. In so doing, the court relied on *Gallegos v. People,* 157 Colo. 484, 403 P.2d 864 (1965), which sanctions the use of such an extrajudicial identification when the description comes from a bystander or victim, usually themselves subject to cross-examination.

A somewhat different situation exists when the jury is advised that the description comes from a co-defendant

whose trial has been severed, and, particularly, when that person is not available for cross-examination. To allow the police chief to relate only the description he broadcast in my view is permissible, although it involves the use of hearsay. To inform the jury that its source was a third defendant, however, circumvents the severance that had been granted, and gives the hearsay extra force in a jury's mind as well. Mr. Justice Stewart stated in his concurrence to *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968):

"A basic premise of the Confrontation Clause, it seems to me, is that certain kinds of hearsay (see, e.g., *Pointer v. Texas,* 380 U.S. 400; *Douglas v. Alabama,* 380 U.S. 415) are at once so damaging, so suspect and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, *whatever* instructions the trial judge might give."

Here, there was no instruction to disregard the source of the descriptions, and in fact the source was repeated upon request of the prosecutor to have the question and answer reread. I would hold this to be reversible error, when considered in connection with the other errors committed.

MR. JUSTICE ERICKSON joins in this dissent.

MR. JUSTICE ERICKSON dissenting.

I respectfully dissent.

I dissent for all of the reasons which Mr. Justice Groves has set forth in his dissent. I also dissent because of the fact that other errors occurred in the course of the trial that were, in my opinion, not harmless.

## I.
## OTHER CRIMES

The majority opinion erodes *Stull v. People,* 140 Colo. 278, 344 P.2d 455 (1959). It does total violence to the theory behind *Drew v. United States,* 331 F.2d 85 (D.C. Cir. 1964). *See Note,* 74 Yale L. J. 553 (1965). The risk of prejudice by the admission of items connected with oher

offenses is too great to cavalierly determine that this was harmless.

## II.
## DEATH CERTIFICATE

The death certificate was admitted as evidence containing inadmissible hearsay. *Orth v. Bauer,* 163 Colo. 136, 429 P.2d 279 (1967); *Interstate Life & Accident Co. v. Wilmont,* 123 Ga. App. 337, 180 S.E.2d 913 (1971); *Charleston National Bank v. Hennessy,* 404 F.2d 539 (5th Cir. 1968). The practice of admitting a death certificate to establish elements of a crime, apart from death, should be condemned. The error is not harmless in my mind.

## III.
## CLOSING ARGUMENT

The district attorney's closing argument cannot, in my mind, be justified as being mere retaliation. Abuses such as occurred in this case were condemned by the Supreme Court of the United States in *Griffin v. State of California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L. Ed. 2d 106 (1965). *See also, Edwards v. Patterson,* 249 F. Supp. 311 (D.C. Colo. 1965). The court, following the comments of the district attorney, which directly pointed to the defendant Kurtz's failure to testify, were condemned as improper. However, no admonition was given to the district attorney, and the court made no attempt to correct the error. The absence of an attempt to correct the error adds to the errors outlined in the dissenting opinions.

## IV.
## CUMULATIVE ERROR

The combined effect of all of the errors was to deny the defendants a fair trial. The record is replete with error and to attempt to single out which of the many errors resulted in a deprivation of a fair trial would be sheer speculation. *Oaks v. People,* 150 Colo. 64, 371 P.2d 443 (1962).

MR. JUSTICE DAY authorizes me to state that he would join in Point IV of this dissent.