No. 23345.

ARTHUR EVERETT SMALL, JR. a/k/a A. E. SMALL, JR. a/k/a
A. E. SMALL v. THE PEOPLE OF THE 'STATE OF COLORADO.
(479 P.2d 386)

Decided December 21, 1970. Rehearing denied February 1, 1971.

306

CLAYTON W. BELL, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, PAUL D. RUBNER, Assistant, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE GROVES.

THE writ of error in this criminal case issued at the

instance of the defendant. He was charged with four counts, namely, confidence game, conspiracy to commit confidence game, obtaining property by false pretenses, and conspiracy to commit the false pretenses offense. He was convicted of the charges contained in the first two counts and acquitted as to the remaining two. We affirm.

The first count in the information charged that the defendant obtained $9,000 from Margaret Spurgeon by means of the confidence game. The second count alleged conspiracy with respect to the transaction described in the first count. Mrs. Spurgeon, who was a widow 86 years of age, had moneys on deposit at several banks and savings and loan associations. The testimony on behalf of the people was to the effect that, in addition to the sum of $9,000 alleged in the information, by similar means the defendant had obtained an additional $29,000 from Mrs. Spurgeon, which was substantially all of her invested money. At the time the defendant was an attorney and, according to some of the People's testimony, with the cooperation of other persons was able to obtain this money by holding himself out to Mrs. Spurgeon and others as her attorney.

I.

Substantially the same series of facts were the basis of counts 1 and 3 (the confidence game and false pretenses counts). Under the first assignment of error the defendant contends that the false pretenses counts could not be joined with the confidence game counts and that the People should have been required to elect between the first and second counts on the one hand and the third and fourth on the other.

The confidence game statute and the false pretenses statute upon which the information was grounded were repealed in 1967 (Colo. Sess. Laws 1967, p. 578, § 19) and replaced by the theft statute. 1967 Perm. Supp., C.R.S. 1963, 40-5-2. It would seem that the problems of joinder and election involved here cannot arise under the theft statute.

 We have concluded that the offense of confidence game as defined by the court's instructions and that of obtaining money by false pretenses were two separate and distinct offenses under our former statutes. While the distinctions may be fine, we believe that it is possible for one to commit the offense of confidence game and not that of false pretenses, and *vice versa*. As limited by the instructions, confidence game consisted of obtaining money from another by a device deceitfully used to gain the confidence of the other. Obtaining money under false pretenses involves knowingly and by design and false pretenses obtaining another's money with intent to cheat or defraud. We conclude, therefore, that the confidence game and false pretenses counts properly could be joined.

This does not mean necessarily that a conviction on all counts, predicated upon the same transaction, could stand. The question was solved in this case, however, by the court's instruction to the jury that, if it found the defendant guilty of confidence game it could not find him guilty of false pretenses; that if it found him guilty of false pretenses it could not find him guilty of confidence game; and if it found him guilty of conspiracy to commit one of the foregoing felonies, it could not find him guilty of conspiracy to commit the other.

 Generally, the matter of election by the People between counts is within the sound discretion of the trial court. Crim. P. 14. *Ruark v. People,* 158 Colo. 287, 406 P.2d 91 (1965); and *Sanders v. People,* 109 Colo. 243, 125 P.2d 154 (1942). Under the People's testimony it might be arguable as to whether the same acts could constitute the felony of confidence game and the felony of obtaining property by false pretenses. Under the circumstances of this case we rule that any abuse of discretion that the court might have committed in failing to require the People to elect was cured by the instruction to elect and the verdicts thereunder.

## II.

 A few months prior to the trial of this action there was considerable publicity given to the refusal of the county commissioners of Boulder County to pay attorney's fees awarded to appointed counsel in a murder case. The defendant here maintains that this publicity and publicity concerning his own case should have caused the court to grant his motion for change of venue. There was no showing that this publicity had any effect on any members of the jury. There is not before us any record of *voir dire* examination. We find nothing in the record indicating prejudice in the jury selection process. The defendant, in addition to some generalized statements, simply alleges violation of "due process," and cites *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). The briefs were filed prior to the announcement by this court of *Walker v. People,* 169 Colo. 467, 458 P.2d 238 (1969). Neither side has filed any supplemental briefs discussing *Walker* and we do not recall it being mentioned in oral argument.

In *Sheppard* the United States Supreme Court held that the publicity was so massive, pervasive and prejudicial as to cause a presumption that a fair trial was denied. In *Walker* this court found a similar situation and ruled that the publicity "was so extensive, so slanted and prejudicial, so calculated to inflame, and so all-pervasive as to posit this case within the holding of *Sheppard.*"

Prior to *Walker* it was the rule of this court that in order to reverse the refusal of a court to grant a motion for change of venue by reason of publicity it must be shown that this publicity had an adverse effect upon the jury panel or a portion thereof. *Oaks v. People,* 161 Colo. 561, 424 P.2d 115 (1967) (petition for habeas corpus granted on other grounds, 278 F. Supp. 703). In *Walker* it was stated:

"The transcript of voir dire is unfortunately in summary form, and we are therefore unable to determine the specific reasons that veniremen were excused from ser-

vice. We are of the opinion that the defendant need not show specific prejudice against him through an examination of the voir dire proceedings."

It was the intent of *Walker* that the rule just quoted should be applied only when the publicity is so extensive and pervasive as was the case in *Sheppard* and *Walker*. The law as announced in *Martz v. People,* 114 Colo. 278, 162 P.2d 408 (1954); *Hopkins v. People,* 89 Colo. 296, 1 P.2d 937 (1931); and *Abshier v. People,* 87 Colo. 507, 289 P. 1081 (1950) is still the law in this state where the publicity is not so extensive and all pervasive. The publicity in the instant matter did not approach the massiveness that it did in *Sheppard* and *Walker*.

### III.

The defendant asserts that the court's refusal to appoint a psychiatrist "for the purpose of establishing the competency" of Mrs. Spurgeon was error. At this point, we interject that we have reviewed the testimony of Mrs. Spurgeon, and it reveals that she was precise in her recollections and statements; moreover, she was quite articulate. It is true that she was 87 years of age at the time she testified, was hard of hearing and tired rather easily, but her testimony appears to us to be that of a person remarkably competent considering her age.

The defendant filed a written motion in advance of trial asking that Mrs. Spurgeon be given a psychiatric examination to determine whether she was competent to testify. The sole ground for this motion was that she was "by her own admission 86 years of age and that infirmities of old age may affect her competency." In arguing this motion the defendant's counsel made the following statement after calling attention to her age:

"On my information and belief, I feel that a psychiatric examination should be given to Mrs. Spurgeon so that we can determine if she is actually competent to testify. I have talked to this particular witness, I think one only needs to go into her home and talk to her and look at her person to determine that she doesn't properly take

care of herself. . . . I feel that Mrs. Spurgeon's health would be in some jeopardy, at least in my unexpert opinion, to have her testify at her age and her condition as I observed it."
The remainder of the statement of counsel is simply argument.

The defendant's attorney did not seek to examine Mrs. Spurgeon at the trial on *voir dire* with respect to her competency. On cross-examination he asked her some questions as to the significance of taking an oath, educational background and the number of times she had seen a physician in the preceding two years. Her answers were such as to strengthen the hearer's opinion that she was competent.

█ █ Without going into the question of whether a court in certain circumstances may order a psychiatric examination of a witness, here there was no basis for the court to grant the defendant's motion for the appointment of a psychiatrist. *Wedmore v. State*, 237 Ind. 212, 143 N.E.2d 649 (1957). The court acted properly within its discretion. Absent any further showing, the matter of her credibility was solely an issue for the jury to consider. *See Howard v. Hester*, 139 Colo. 255, 338 P.2d 106 (1959); *Hood v. People*, 130 Colo. 531, 277 P.2d 223 (1954); *Tubbs v. Hilliard*, 104 Colo. 164, 89 P.2d 535 (1939); and *Brasher v. People*, 81 Colo. 113, 253 P. 827 (1927).

The defendant contends that error was committed in the court's failure to allow defendant's attorney to testify concerning the competency of Mrs. Spurgeon. We find no such request of the defendant at the folios of the record to which he has made reference in his briefs. We did not notice any such request in our reading of the record. Counsel did ask to testify on the venue question and the court denied the request for the reasons that this would be unethical and that it was apparent that the testimony of the attorney would be hearsay.

## IV.

Error is claimed as a result of the testimony of Mrs. Spurgeon and an agent of the Federal Bureau of Investigation concerning a conversation had during a telephone call made to Mrs. Spurgeon on August 5, 1966. According to testimony presented on behalf of the People, Mrs. Spurgeon was contacted on February 1, 1966 by a man claiming to be a Government auditor who said his name was "Granich"; Mr. "Granich" informed her that someone was tampering with her bank accounts and, as an attorney, he would help her; he advised her that he was sending a taxi for her, and she should use it to go to the bank and withdraw $6,000 and return with it to her home; he further told her that she was to turn the $6,000 over to a "Pinkerton man" who would deposit the money in a "Government bank" for safe keeping; she complied with the directions and turned the money over to the "Pinkerton man"; during the following month the defendant and another man called on Mrs. Spurgeon and offered to help her regain the $6,000, the defendant stating that he was from the same office as "Mr. Granich"; according to the People's testimony, as time went on the defendant convinced Mrs. Spurgeon that she should lay out substantial amounts in order to recover the sums previously paid over by her.

Bank officers became suspicious and notified the Federal Bureau of Investigation, which entered the case because of possible impersonation of federal officials. While the agent of the Federal Bureau of Investigation was at Mrs. Spurgeon's house on August 5, 1966, Mr. "Granich" telephoned Mrs. Spurgeon and the agent placed his ear near the telephone earpiece, with the result that both he and Mrs. Spurgeon heard the conversation.

Mrs. Spurgeon testified that during this conversation she said to Mr. "Granich," "You sound like Mr. Small." The trial took place more than nine months following the telephone conversation. The agent then testified that, based upon hearing Mr. Small (the defendant) in the

courtroom that day, he detected a distinct similarity between the voice of Mr. "Granich" and that of the defendant.

With respect to this testimony, the defendant's first point is that testimony of such comparisons, particularly when nearly ten months had elapsed before the agent heard the defendant's voice, is incredible and inadmissible. In *Morgan v. Brinkhoff,* 145 Colo. 78, 358 P.2d 43 (1960) this court concluded otherwise.

The second argument of the defendant is predicated upon *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This argument is two pronged: that the conversation heard by the agent amounted to an illegal search and that the eavesdropping was without the consent of the calling party. *Katz* is clearly distinguishable. In it a device was attached to a telephone booth. No such circumstance is involved here. Under *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), it is admissible if the consent to overhear is obtained from one party to the conversation. The agent had Mrs. Spurgeon's consent.

V.

In the defendant's motion for new trial it was alleged that there was newly discovered evidence concerning the telephone "calls" in which the F.B.I. agent joined with Mrs. Spurgeon in listening to the voice at the other end of the line. The motion set forth that since the trial the defendant had discovered from the records of the Jefferson County Sheriff's office that he, the defendant, had been lodged in jail on August 3 and 4, 1966. There are several reasons why this is not a good ground for granting a new trial. Our reading of the record discloses that the agent first met Mrs. Spurgeon on August 5, 1966, and that it was on that date that there transpired the one telephone call in which the agent listened with Mrs. Spurgeon. Further, due diligence during the trial would have caused the defendant to perceive that he was in jail less than ten months beforehand. *Kelley v.*

*People,* 166 Colo. 322, 443 P.2d 734 (1968); and *Gasper v. People,* 83 Colo. 341, 265 P. 97 (1928). In addition, the Attorney General points out that it would have been entirely possible for the defendant to make the call from the jail.

### VI.

The defendant has urged that prejudicial error was committed in the refusal of six of his tendered instructions and the giving of two tendered by the People. Our study of them convinces us that the instructions tendered by the defendant either were erroneous or the subject matter thereof adequately embraced within instructions that were given, and that the two instructions which were given did not constitute prejudicial error. No unique or unusual principal of law would result from a discussion of these instructions and, therefore, we elect not to do so.

After careful study, we have concluded that the five other assignments of error are without merit.

Judgment affirmed.

MR. CHIEF JUSTICE PRINGLE, MR. JUSTICE DAY and MR. JUSTICE HODGES concurring.